UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Kelsey, Beales and Senior Judge Clements


SANIA L. MIKHAIL

MEMORANDUM OPINION*

v.     Record No. 0215-13-4                            PER CURIAM
                                                    JULY 23, 2013

FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
R. Terrence Ney, Judge

(Joseph W. Bolognesi; Wayne D. Berthelsen, Guardian *ad litem* for
appellant, on briefs), for appellant.

(David P. Bobzien, County Attorney; Peter D. Andreoli, Jr., Deputy
County Attorney; May S. Kheder, Assistant County Attorney;
Kathleen Rust Bell, Guardian *ad litem* for the minor child, on brief),
for appellee.


Sania L. Mikhail (mother) appeals an order terminating her parental rights to her child, A.E.

Mother argues that the trial court erred in terminating her parental rights because the Department of

Family Services (the Department) failed to prove by clear and convincing evidence, that (1) mother

was, without good cause, unwilling or unable within a reasonable period of time, to remedy

substantially the conditions which led to or required continuation of the placement of the child in

foster care; (2) the termination of parental rights was in the best interests of the child; (3) the

Department had provided reasonable and appropriate rehabilitative services, particularly anger

management services, to mother prior to the termination of her rights; and (4) the Department had

provided mother with sufficiently frequent and proper visitation with the child after the child was

placed in foster care.  Mother further argues that the trial court erred by denying her motion to strike

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

the Department's evidence on the grounds that the Department had failed to meet its burden of proof. Upon reviewing the record and briefs of the parties, we conclude that this appeal is without merit. Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

## BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

A.E. is the child of mother and Atia Elyass (father). A.E. was born in 2004. The Department initially became involved with the family in 2008 because of a concern about lack of supervision. The Department provided numerous services to the family.

In March 2009, mother attempted suicide after fighting with father. Mother was hospitalized, and a safety plan was put into place with father as the primary caretaker for A.E. The family sought reunification services from the Department, which the Department attempted to facilitate. In May 2009, there was another incident regarding lack of supervision. Another safety plan was put into place with father having primary responsibility for A.E.; however, father was unable to follow through and left daily tasks to mother.

In early October 2010, mother called the Department and told the social worker that she was frustrated and could not care for the child. The Department also received reports that the child had been exposed to domestic violence and mother's mental instability. On October 8, 2010, the Department removed the child from the parents' custody after it learned that the child, who was six years old at the time, left the home while mother and father were arguing. The child walked across a busy street to a grocery store parking lot at night. The Department also filed a petition alleging that the child was abused and neglected.

Mother has bipolar disorder, borderline personality disorder, and post-traumatic stress disorder. When the Department removed A.E. from the home, mother had not been compliant with her medication and mental health treatment. She was hospitalized in a psychiatric hospital, and a guardian *ad litem* was appointed to represent her best interests.

On November 12, 2010, the Fairfax County Juvenile and Domestic Relations District Court (the JDR court) entered an order finding that the child was an abused and/or neglected child. The JDR court approved the foster care plan with the goal of return home.

Mother was ordered to undergo a neuropsychological evaluation and a parent-child assessment and to follow any treatment recommendations. Mother also was ordered to be compliant with her mental health treatment.

In November 2010, Dr. Carolyn Corbett conducted a parent-child assessment on mother, father, and the child. Mother and father were argumentative during the parent-child assessment. They were unable to follow Dr. Corbett's lead with structure and setting limits for the child. Father would try to interact with the child, but mother would become agitated and yell at father. Father eventually withdrew. The child withdrew and played by himself while his parents were arguing. Dr. Corbett concluded, "Prognosis for improvement is severely guarded."

In November 2010, Dr. William Ling conducted a neuropsychological evaluation on mother and a psychological evaluation on father. Dr. Ling concluded that mother's psychological problems affected her parenting capacity. He stated that mother's prognosis for her ability to parent a child was "guarded," and the likelihood that it would change was "highly unlikely."

In April 2011, mother attended parenting classes and completed them.

In June 2011, mother and father started couples' therapy with Dr. Manal Abukishk. Mother could not control her anger and was verbally abusive toward father. Dr. Abukishk held

five joint sessions before deciding to see mother and father individually. Mother's uncontrolled rage, which manifested itself even though she was on medication, affected her ability to successfully complete therapy. She stopped individual sessions in May 2012.

The parents were reevaluated by Dr. Corbett and Dr. Ling. Despite mother having received services, Dr. Corbett remained concerned about mother's ability to parent A.E. Dr. Corbett explained that mother's personality disorders were "ingrained and extremely resistant to treatment." Her prognosis remained "extremely guarded." Dr. Ling also remained concerned about mother's ability to parent the child.

While the child was in foster care, mother had regular visits with him, including visitations at her home. However, mother had a history of being hostile toward the social worker. If mother became stressed or did not understand something, she would become volatile and threaten the social worker. On one occasion in March 2012, she became extremely hostile and could not calm down. As the driver was leaving with the child, mother yelled at A.E. "to go for adoption if A.E. wanted to," and she banged on the hood of the car. After that incident, all visitations were conducted at the Department's office.

On November 28, 2011, the JDR court held a permanency planning hearing and approved an interim plan with a goal of return home and a concurrent goal of adoption.

The Department subsequently filed a petition to terminate mother's parental rights and filed a foster care plan with the goal of adoption. During this time period, mother participated in Dialectical Behavior Training (DBT) and the ADAPT program in order to better control her behavior and improve her anger management skills. On September 4, 2012, the JDR court

entered an order terminating mother's parental rights and approved the goal of adoption.[1]

Mother appealed to the circuit court.

There was evidence that the child was doing well in foster care. The child has become attached to the foster parents. Since November 2010, the child has been in therapy with Dr. Sharon Lucas. Dr. Lucas diagnosed the child with attention deficit hyperactivity disorder, post-traumatic stress disorder, anxiety not otherwise specified, and dysthymic disorder. Dr. Lucas testified that the child was afraid to visit with mother unless another person was present "to protect" the child. She opined that the child's prognosis was good, so long as the child could remain in the same environment with the foster parents.

The trial court heard evidence on November 27 and 28, 2012 and January 2 and 16, 2013. After hearing all of the evidence and argument, the trial court terminated mother's parental rights and approved the foster care plan with the goal of adoption.[2] This appeal followed.

ANALYSIS

*Termination of parental rights – Issues 1-3*

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citations omitted).

The trial court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or
> unable within a reasonable period of time not to exceed twelve

---

[1] The JDR court also terminated father's parental rights, and father appealed to the circuit court.

[2] The trial court also terminated father's parental rights, and father appealed the ruling to this Court. See Elyass v. Fairfax Cnty. Dep't of Family Servs., Nos. 0667-13-4 and 0684-13-4.

months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Mother argues that the trial court erred in finding that she had been unable or unwilling, within a reasonable period of time, to remedy substantially the conditions which led to or required continuation of A.E. being in foster care. When A.E. entered foster care, the Department was concerned with mother's ability to supervise the child, domestic violence in the home, and mother's volatility. For approximately two years, the Department worked with the family. Initially, the goal was to return the child home. The Department provided numerous services to the family; however, mother was unable to demonstrate her ability to safely and effectively parent A.E.

For example, in March 2012, after more than a year of services, mother became angry during a visitation. The home based worker was late, and the driver had to take the child to a nearby restaurant to go the bathroom. Mother became enraged, even though the child was coming back for visitation. Mother could not calm down, despite attempts by the social worker and home based worker. At that time, mother had over a year of counseling and services, but she still was unable to control her anger. She exploded at the social workers and yelled at the child. She had not improved the conditions which led to the child's placement in foster care.

In addition, despite the fact that the parents had a history of domestic violence and could not participate in joint counseling, they continued to remain together. Mother continued to yell and berate father. They could not participate in visitations together because she would become too angry. Both father and the child would withdraw to avoid mother's anger. Mother could not see how her behavior impacted A.E.

Mother contends the Department erred by not providing her with reasonable and appropriate rehabilitative services, especially anger management services.

The Department provided mother with numerous services, including at home services, parenting classes, individual therapy, and couples therapy. The counselors in individual therapy and couples therapy addressed mother's anger and volatility. They offered ways for her to control her behavior and anger. However, after more than a year and a half of services, the counselors remained "guarded" about mother's ability to parent A.E. Mother continued to have instability and volatility, despite participating in counseling. Mother lacked the insight to modify her behavior. In contrast, mother's psychiatrist testified that mother is better at controlling her emotions, and further testified, "I think she may be able to handle different pressures in her life while she's continuing her medication as well as therapy." The trial court noted that the psychiatrist testified that with respect to her bipolar disorder, mother would be in treatment her whole life.

When considering termination of parental rights, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463.

Although there was evidence that mother loved her child, she did not act in his best interests. Visitations with mother were often chaotic. The child told a counselor that the child wanted to visit mother only when a third person was present "to protect" the child. She would force food on the child during visitations, despite being told not to do so.

Mother was unable to show that she could meet the child's emotional needs. The child's counselor spoke with the parents at a family partnership meeting in March 2012. As the counselor explained the child's needs, she noticed "how difficult it was for [A.E.'s] mother to hear maybe some of the things that she felt uncomfortable with and, unfortunately, she became

very irritable and angry in the session . . . ." Several counselors remained "guarded" about mother's ability to parent the child.

Shortly before the hearing, mother still could not see how her choices might negatively impact the child. She learned that she was pregnant and wanted to tell A.E. The counselors told her that it could be "very disrupting" to the child and told her not to tell A.E. Mother could not understand how or why A.E. might be upset to learn that she was pregnant. Mother testified that she disagreed with the counselor's decision not to tell A.E. about the pregnancy because "in my feeling inside, [A.E.], would be happy for that. Even if A.E. don't happy, A.E. will know there is a family for A.E. waiting for him." She further stated, "I have my right to tell A.E. or not." Despite the admonition from the counselor not to tell the child about the pregnancy, mother told father to tell the child about the pregnancy. Father did, and the child became upset. The foster mother said that she had not seen the child that upset since the child first came to live with them over two years earlier. Mother's lack of concern or understanding about the child's feelings continued. Even at the trial, she did not understand why A.E. might be upset. Mother disregarded the counselor's advice and did what she wanted to do.

When it issued its ruling, the trial court noted that the Department removed the child in 2010 in order to protect the child because "[t]he parents of this child were so unable to get along with each other and so neglectful of the child's best interests." The trial court summarized the evidence from the numerous witnesses, including the parties, the social workers, and the counselors. The trial court concluded, "Neither of these individuals – neither the mother nor the father – each of whom, both of whom love this child, are able in the Court's opinion, by clear and convincing evidence, to parent either individually or even more dramatically together . . . ." As a result, the trial court held that it was in the best interests of the child that mother and father's parental rights be terminated.

The child had been in foster care for over two years when the trial court issued its ruling. Mother had not been able to remedy the situation that led to the child being placed in foster care. Despite counseling and other services, several counselors expressed concern about mother's ability to parent A.E.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

The trial court did not abuse its discretion in terminating mother's parental rights. There was sufficient evidence to prove that mother was unable to remedy the conditions which led to the child's placement in foster care and that the Department had provided appropriate services to mother. Furthermore, there was sufficient evidence to prove that termination of mother's parental rights was in the child's best interests.

*Visitation – Issue 4*

Mother argues that there was "insufficient evidence to show that [t]he mother, Sania Mikhail, had been provided sufficiently frequent and proper visitation with the child, A.E., after the child was placed in foster care." Mother contends her bond with the child was affected negatively by visiting her child once per week. She asserts her visitations should have increased as she complied with the Department's requests.

The trial court did not make a ruling that the Department provided appropriate, or inappropriate, visitation to the mother. Accordingly, "there is no ruling for us to review on appeal." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 489 (1998). See Fisher v. Commonwealth, 16 Va. App. 447, 454, 431 S.E.2d 886, 890 (1993).

*Motion to strike – Issue 5*

Mother argues that the trial court erred in denying her motion to strike the Department's evidence at the conclusion of the Department's evidence and at the conclusion of the trial.

On appeal, the Court, in reviewing the ruling, to strike a plaintiff's evidence "must view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff." Economopoulos v. Kolaitis, 259 Va. 806, 814, 528 S.E.2d 714, 719 (2000) (citing West v. Critzer, 238 Va. 356, 357, 383 S.E.2d 726, 727 (1989)). "The standard for reviewing a plaintiff's evidence on a motion to strike evaluates whether plaintiff has made a *prima facie* case . . . ." Klein v. Klein, 49 Va. App. 478, 481, 642 S.E.2d 313, 315 (2007).

Here, the Department made a *prima facie* case for termination of mother's parental rights under Code § 16.1-283(C)(2). As discussed above, there was sufficient evidence to prove that mother had not remedied the situation which led to the child being placed in foster care and remaining in foster care. Furthermore, there was sufficient evidence to prove that termination of mother's parental rights was in the best interests of the child. Therefore, the trial court did not err in denying mother's motion to strike.

CONCLUSION

For the foregoing reasons, the trial court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.